# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SCHLANGER INSURANCE TRUST, (ANDREA SCHLANGER, TRUSTEE), | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 10-CV-576-TCK-TLW |
| JOHN HANCOCK LIFE INSURANCE (U.S.A, INC.); MORGAN STANLEY SMITH BARNEY, LLC; and J. CHARLES ADAM, JR., | ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the Court is the Motion for Summary Judgment of Defendants Morgan Stanley Smith Barney, LLC and J. Charles Adam (Doc. 101).

**I.  Background**

The following facts are derived from the summary judgment record, construed in a light most favorable to Plaintiff.

**A.  Parties**

Plaintiff Schlanger Insurance Trust ("Plaintiff or Trust") is an Oklahoma trust, of which Andrea Schlanger ("Schlanger") is the sole trustee. Schlanger and her two sisters are the beneficiaries of the Trust. Schlanger is an attorney and has received an LL.M. Prior to managing her family's business, Schlanger practiced law in the area of estate planning. Schlanger admits to being knowledgeable of securities investments and general estate planning but denies having any experience or specialized knowledge regarding life insurance policies.

Defendant John Hancock Life Insurance (U.S.A.), Inc. ("Hancock")[1] is the predecessor of Manufacturers Life Insurance Company (U.S.A.) ("Manulife"), which issued a life insurance policy ("Manulife Policy") on the life of Schlanger's mother, Sondra Rose Schlanger ("Rose Schlanger").[2] The Trust was the beneficiary of the Manulife Policy. Defendant J. Charles Adam, Jr. ("Adam") is employed by Defendant Morgan Stanley Smith Barney, LLC ("MSSB") as an insurance planning specialist. Adam and MSSB (collectively "Defendants") were involved in the Trust's purchase of the Manulife Policy, which is the subject of this litigation.

### B. Purchase of the Manulife Policy

Prior to the Manulife Policy, the Trust owned a universal life insurance policy ("Conseco Policy") through Conseco Life Insurance Company, which was a subsidiary of Conseco, Inc. ("Conseco"). The Conseco Policy was issued as a "last to die" policy when Rose Schlanger was 68 years old and her husband was still living. By May of 2002, when Rose Schlanger was 86 years old, the Conseco Policy had a death benefit of $1,000,000.00 and an accumulated cash value of $552,156.00.

According to Schlanger, her brother-in-law Wynn Wozobski ("Wozobski"), an MSSB financial adviser, called her in January or February of 2002 and raised the issue of whether the Conseco Policy was in credit trouble. Schlanger felt obligated to explore this issue, and Wozobski told her he would consult the "insurance guru" at MSSB. Schlanger also asked Wozobski to find her the name of a local insurance lawyer, and Wozobski recommended Chuck Rains ("Rains").

---

[1] Plaintiff settled with Hancock, and Hancock is no longer a party to the litigation.

[2] Rose Schlanger died on July 26, 2012, during the pendency of this lawsuit and after completion of the summary judgment briefing.

2

After leaving a message for Rains, Schlanger ran into Rains on a downtown sidewalk, and they had a brief conversation during which Rains told her that Conseco was in trouble. Schlanger testified that she never formally retained Rains and that their conversation lasted no more than thirty seconds.

Wozobski ultimately put Schlanger in touch with Adam, an MSSB insurance specialist located in Houston. Schlanger contends that Adam was the Trust's principal adviser regarding the decision of whether and with what to replace the Conseco Policy. Schlanger testified that she was still weighing her options when she began consulting with Adam and that Adam ultimately "pressured" her into purchasing the policy because the credit value of the Conseco Policy was at serious risk. In contrast, Adam testified that he advised her against replacing the Conseco Policy:

> I told her I did not think the Conseco policy was in danger of failing to pay . . ., and . . . if she pursued the Manulife policy, she was paying a fair amount of additional capital for what she perceived, and I didn't, to be a superior opportunity to make certain the death claim was paid.

(Adams Dep., Ex. G to Pl.'s Resp. to Defs.' Mot. for Summ. J., at 33:1-12.) On May 12, 2002, the Trust, by and through Schlanger, purchased the Manulife Policy to replace the Conseco Policy.

### C. Lapse of the Policy

Under the Manulife Policy, the payment of annual premiums was optional and was left to the policy owner's discretion. This decision depended on financial analyses, and Schlanger contends that she relied upon Adam's advice in making these discretionary decisions regarding whether to pay annual premiums. The policy also contained a provision regarding an optional "Policy Protection Rider." In simplest terms, this rider offered some form of protection against the policy lapsing due to a low cash value. Again, the decision of whether to pay the Policy Protection

3

Rider premium was discretionary, and Schlanger contends that she relied upon Adam in making decisions regarding the Policy Protection Rider.[3]

According to Schlanger, the following events occurred prior to lapse of the Manulife Policy: (1) Adam advised her not to pay premiums in 2003, 2004, or 2005, despite that the Trust was able to make such payments; (2) Adam advised her in June 2007, upon receipt of the annual statement, that all was well with the policy; (3) she began receiving notices on January 20, 2009, warning her that the Policy Protection Rider was about to lapse; (4) Adam advised her, in a March 23, 2009 email, not to pay the Policy Protection Rider premium, despite that the Trust was able to make such payment; (5) Adam advised her, during a June 18, 2009 meeting, not to pay the Policy Protection Rider premium and that the policy was not in jeopardy of lapsing; (6) upon Adam's advice, she made a premium payment of $55,700 on June 25, 2009; (7) in July 2009, Adam called Manulife and asked the service agent for clarification and explanation of the Policy Protection Rider and when it lapsed; (8) from January to April 2010, she received several Termination Warning Notices, advising her of minimum amounts owed in order to keep the policy in place for certain amounts of time; (9) such amounts were so high that it did not make financial sense to pay the amounts in order to maintain the policy; and (10) she allowed the policy to lapse on June 19, 2010.

## II. Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite*

---

[3] The nature of the Manulife Policy is complex. It is not necessary to explain the intricacies of the policy in order to rule on the pending motions, and the Court does not attempt to do so.

*Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id*. However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

## III.   Statute of Limitations[4]/Waiver

Defendants contend that Schlanger had discovered or was on inquiry notice of all claims against Defendants no later April 7, 2003, and that her claims are therefore barred by their relevant statutes of limitation. To establish this "discovery" as a matter of law, Defendants rely exclusively upon on April 7, 2003 email sent from Schlanger to Adam:

> Dear Chuck:
> For some time now, I have been thinking of the many disappointments I have had to endure while spending money with Smith Barney/ManuLife on the policy we worked on last summer. From the sloppy beginning to the e-mail with the misspelled Surname of recent date, I am totally astounded, unnerved and disgusted with the lack of respect shown on this policy. I truly wish I had taken my chances with Conseco or taken the cash value and invested in T-bonds. But, since I made what I consider to be a major mistake in judgment and went forward with the policy, I, as a Trustee,

---

[4] In its discretion and due to a lack of prejudice to Plaintiff, the Court permits Defendants to raise their statute of limitations defense despite failure to plead it in their Answer. *See* 5 Wright, Miller, and Kane, *Federal Practice & Procedure* § 1278 ("Thus, as discussed in the preceding section, the substance of many unpleaded Rule 8(c) affirmative defenses may be asserted by pretrial motions, particularly in the absence of any showing of prejudice to the opposing party and assuming it has had an opportunity to respond.") (collecting cases at notes 24 & 25); *Expertise, Inc. v. Aetna Finance Co.*, 810 F.2d 968, 973 (10th Cir. 1987) (holding that failure to plead statute of limitations in an answer did not preclude trial court from permitting defense at trial, so long as it was included in the pretrial order).

5

> need to ask one question. On one of the hot summer's afternoon when Wynn, you and I sat in his office and discussed this transition into the Manulife policy a representation was made by Wynn that I would receive a Status statement every 6 months just as he did on his own policies. If you will recall, he even showed me what a statement would contain. No one ever told me that I would not receive such statements, I do not consider an e-mail from someone I have never heard of and who may or may not be a Manulife representative (how can one really know in an email?) an official status statement. I expected to receive a mailed statement bearing Manulife signatures, etc. Am I not going to receive this type of statement every six months as I was told I would? Was that mere puffery that I fell for? I clearly recall that you told me that you would sit down with me every 6 months and review things with me. Chuck, I am not an insurance maven and I am very uncomfortable with the lack of attention I am receiving from everyone concerned during this first year of the policy. I have received no written information which I, as an Attorney, consider appropriate and I want something from the company showing the performance to date. Can you arrange that for me?
>
> Andrea Schlanger

(Def.'s Mot. for Summ. J., Ex. 72.)

The email reveals Ms. Schlanger's frustration with certain clerical problems, Manulife's failure to issue semi-annual statements to Plaintiff, and an overall "lack of respect" shown to her regarding the Manulife Policy. This email does not demonstrate, as a matter of law, that Schlanger was aware of or, in the exercise of reasonable diligence, should have been aware of all alleged misrepresentations and breaches of duty that occurred prior to this email. In addition, much of the conduct forming the basis of Plaintiff's claims – such as Adam's advice not to pay certain annual premiums, Adam's advice not to pay the Policy Protection Rider premium, and Adam's advice that "all was well" with the policy – occurred well after the April 7, 2003 email. Therefore, this email does not establish that Plaintiff had discovered or was on inquiry notice, by April 7, 2003, of the breach of implied contract and tort claims asserted in this lawsuit.

Defendants also argue that statements in the April 7, 2003 email regarding Schlanger making a "mistake in judgment" amount to a waiver of the Trust's right to assert the claims in this lawsuit.

6

"[W]aiver is the intentional relinquishment of a known right." *In re Sweet*, 954 F.2d 610, 613 (10th Cir. 1992). "The party invoking waiver as a bar is required to show that the person against whom the bar is asserted did, at the time of the transaction, have knowledge, actual or constructive, of the existence of his rights and of all the material facts upon which they depended." *Guinn v. Church of Christ of Collinsville*, 775 P.2d 766, 777 n.42 (Okla.1989). "No one can be bound by a waiver of one's rights unless it was made with full knowledge of the rights intended to be waived." *Id.* Defendants have wholly failed to demonstrate the elements of waiver, particularly that Schlanger intended to waive the Trust's right to sue or was aware of all the material facts informing such decision. Therefore, Defendant's motion for summary judgment based on expiration of the relevant statutes of limitation and the common law doctrine of waiver is denied.

## IV. Contract Claims

### A. Breach of Contract - Count 1

Plaintiff has conceded that Defendants are entitled to summary judgment as to the breach of contract claim alleged in Count 1, which alleges breach of the Manulife Policy. The Court finds that Defendants are entitled to summary judgment on Count 1, as neither Adam nor MSSB are parties to the Manulife Policy.

### B. Breach of Contract - Count 5

The Court begins by construing the parameters of Count 5, which is entitled "Breach of Contract – Advice Not to Pay 2003-2005 Premiums." Count 5 specifically alleges that this advice by Adam – namely, not to pay certain annual premiums – did not meet the standard of care employed by insurance agents in the industry and therefore breached implied obligations flowing

7

to Plaintiff from its insurance agent under Oklahoma common law. In its response brief, Plaintiff identified additional conduct by Adam in support of Count 5. Specifically, Plaintiff argued:

> The facts set forth above establish that (I) [MSSB], through its employee Adam, promised to advise the Trust concerning both the purchase of the Manulife Policy and the continuing payment of premiums under the Policy (including particularly the Policy Protection Rider premiums), (ii) [MSSB], through its employee Adam, advised the Trust not to pay the Policy Protection Rider premiums, (iii) [MSSB], through its employee Adam, advised the Trust that the Manulife Policy was not in danger, and (iv) the [MSSB] advice did not meet the standard of care usually and customarily employed by insurance agents in the industry. MSSB's advice not to pay the premiums followed [MSSB's] 'worst case scenario' assurances in Adam's email dated May 13, 2002. In that email, Adam assured Ms. Schlanger that the $55,700 annual premium guaranteed that 'the policy face amount would be paid in a worst case scenario,' (ii) that even to reach the point where the 'guaranteed values are realized' would mean a 'dire situation' for the insurer, and (iii) that 'anything better than the worst case scenario would mean fewer premiums' than the $55,700 each year. There is implied in the services contract between the Trust and [MSSB] an obligation to provide those services in accordance with the generally accepted standards of the industry. The substantial evidence, cited above, is probative of the fact that [MSSB] breached that implied obligation.

(Pl.'s Resp. to Defs.' Mot. for Summ. J. 17-18 (footnotes and citations omitted).) In its reply, Defendants did not seek to limit Count 5 to the conduct alleged in the Complaint. (*See* Defs.' Reply in Support of Mot. for Summ. J. 4.) In the interest of justice and due to the acquiescence of Defendants, the Court construes Count 5 broadly to include any conduct by Adam that potentially breached this implied obligation.

It is also unclear from the Complaint whether Count 5 is asserted against Adam, MSSB, or both. However, in its response brief, Plaintiff clarified that Count 5 was asserted only against MSSB. (*See* Pl.'s Resp. to Defs.' Mot. for Summ. J. 17 ("[MSSB] is liable . . . for a breach of [MSSB's] contractual obligation to provide insurance agent's services to the Trust in connection with the sale and administration of the Manulife policy.") (alleging that MSSB, "by and through its employee Adam," broke certain promises and gave advice that did not meet the standard of care for

8

insurance agents). Thus, the Court construes Count 5 as being asserted only against MSSB, based on the actions of Adam acting as MSSB's employee and agent.

### 1. Defendants' Arguments in Motion for Summary Judgment

With the parameters of Count 5 defined, the Court turns to Defendants' arguments in support of summary judgment. In their motion for summary judgment, Defendants raised the following three arguments: (1) Adam is not a party to any contract with Plaintiff; (2) Plaintiff's claims are based upon breaches of oral promises that are barred by the parol evidence rule; and (3) Plaintiff cannot establish any breach of the Manulife Policy. (*See* Defs.' Mot. for Summ. J. 18-21.) The first argument is moot because the Court has construed Count 5 as asserted only against MSSB. The third argument is moot because it pertained only to Count 1, upon which the Court has granted summary judgment in favor of Defendants. The Court will address the second argument.

Under Oklahoma law, the parol evidence rule "provides that parol evidence cannot vary, modify or contradict the terms of an executed written agreement." *First Nat'l Bank in Durant v. Honey Creek Entertainment Corp.*, 54 P.3d 100, 103 (Okla. 2002). Defendants contend that Count 5 is impermissibly based upon "oral representations outside the written contract" and that such representations cannot support a breach of contract claim. (Defs.' Mot. for Summ. J. 19-20.) This argument is misplaced. The contract allegedly breached in Count 5 is not the Manulife Policy. It is the implied contract between an insurer and the insurance agent procuring insurance on his behalf. *See Swickey v. Silvey Cos.*, 979 P.2d 266, 268 (Okla. Civ. App. 1999) ("There remains, however, a duty on the part of [the insurance] Agency to exercise reasonable care and skill in performing its tasks, i.e. procuring insurance and making any necessary corrections or adjustments after a policy is issued."); *Kutz v. State Farm Fire & Cas. Co.*, 189 P.3d 740, 744-45 (Okla. Civ. App. 2008) ("An

9

agent has the duty to act in good faith and use reasonable care, skill and diligence in the procurement of insurance and an agent is liable to the insured if, by the agent's fault, insurance is not procured as promised and the insured suffers a loss."); *Fitz v. Town of Shattuck*, No. CIV-11-0937, 2011 WL 5117612, at * 1 (W.D. Okla. Oct. 25, 2011) ("The contract between the agent and insured can be implied, but the insured must demonstrate the agent agreed to procure insurance with specific terms and failed to do so. Additionally, the agent has a duty to exercise reasonable care and skill in procuring insurance and otherwise performing its tasks.").[5] Plaintiff is not attempting to enforce any oral promises that are contrary to the terms of the Manulife Policy. Plaintiff is attempting to establish breach of an entirely different set of unwritten, implied obligations, and Plaintiff is entitled to present evidence of oral representations made by Adam in an attempt to prove breach of these implied obligations.

### 2. Defendants' Argument in Reply Brief

In their reply, Defendants argue that Adam's conduct cannot support a claim under *Swickey* and its progeny for the following reasons:

> Ms. Schlanger, acting as Trustee of the Schlanger Insurance Trust, *insisted on* purchasing, a policy offering a death benefit of $1,000,000. Despite the inherent difficulties in obtaining life insurance coverage for an 87 year old with a history of cancer, Mr. Adam and MSSB procured the Manulife Policy which is the subject of this suit, while meeting the Plaintiff's demand for $1,000,000 coverage. The Manulife Policy lasted into its seventh year, despite prolonged low interest rates. Mr. Adam and MSSB are entitled to summary judgment insofar as the Plaintiff's breach of contract claim is based upon an alleged failure to procure insurance.

---

[5] The Court refers to this line of decisions as *Swickey* and its progeny. *Swickey* and its progeny establish that an insured may seek to hold its agent liable under either contract or tort theories. *Fitz*, 2011 WL 5117612, at * 1 ("Under Oklahoma law, an insurance agent can be liable to an insured under either breach of contract or tort theories for failure to procure insurance."). Here, Plaintiff's cause of action based on *Swickey* and its progeny sounds in breach of contract.

> The Plaintiff contends MSSB "breached its contract when it advised the Trust not to pay premiums," and that "John Hancock cancelled the policy on the basis that the premiums had not been paid." The undisputed evidence shows Mr. Adam did not advise the trust not to pay premiums. Instead, Mr. Adam stressed to Ms. Schlanger that: "*I am not suggesting that you budget paying no further premiums on a $1,000,000 policy.*" (Exhibit 57 to Motion for Summary Judgment; Adam Depo., pp. 41-42).

(Defs.' Reply in Support of Summ. J. 4-5 (some internal citations omitted).)[6]

The Court rejects these fact-based arguments for two reasons. First, Defendants have not established as a matter of law that Schlanger "insisted" on the purchase of the Manulife Policy or on replacing the Conseco Policy at all. Schlanger contends that Adams falsely or recklessly advised her to procure the Manulife Policy and that Adam did not reasonably advise her regarding the terms and risks of the policy upon its procurement. While Schlanger admits that she insisted on a particular value of any replacement policy and that such a policy was ultimately obtained, there nonetheless exist questions of fact regarding whether the policy was properly and reasonably procured by Adam. Further, although Defendants laud the overall performance of the Manulife Policy, this is not controlling as to the question of whether Defendants breached any implied obligations flowing to Plaintiff. Even assuming the policy performed as expected or better than expected, Schlanger contends that she was not properly advised as to the overall nature of the policy or how to maximize its value and duration, rendering the actual performance of the policy of little relevance. Although Schlanger admits that she was presented with various scenarios and warned of policy lapses, there exists record evidence that such scenarios were not accurately presented

---

[6] Defendants did not argue that it cannot be held liable under *Swickey* and its progeny for any post-procurement conduct. Nor are there any motions in limine on this topic. Therefore, the Court has considered all evidence presented by Plaintiff in determining whether Defendants are entitled to summary judgment on this claim.

and/or understood by Adam. Second, Schlanger's testimony and other record evidence creates a question of fact as to whether Adam advised the Trust not to pay certain annual premiums. Defendants' attempt to characterize this fact as "undisputed" is wholly meritless. Plaintiff has presented sufficient evidence to reach a jury on the question of whether MSSB may be held liable for breach of implied contractual obligations under *Swickey* and its progeny, and MSSB is not entitled to summary judgment on Count 5.

## V. Tort Claims

### A. Fraudulent Inducement (Count 2)

The parties agree that the general elements of actual fraud govern Plaintiff's claim for fraudulent inducement. Under Oklahoma law, the elements of actionable fraud are: "1) a false material misrepresentation, 2) made as a positive assertion which is either known to be false or is made recklessly without knowledge of the truth, 3) with the intention that it be acted upon, and 4) which is relied on by the other party to his (or her) own detriment." *Bowman v. Presley*, 212 P.3d 1210, 1218 (Okla. 2009); *Tice v. Tice*, 672 P.2d 1168, 1171 (Okla. 1983); *Bankers Trust Co. v. Brown*, 107 P.3d 609, 613-14 (Okla. Civ. App. 2004). "The basis of fraudulent misrepresentation is the creation of a false impression and damage sustained as a natural and probable consequence of the act charged," and the "fraudulent representation need not be the sole inducement which causes a party to take the action from which the injury ensued." *Id.* "The key is that without the representation the party would not have acted." *Id.* "The liability for misrepresentation depends upon whether the person relying thereon was in fact deceived, not upon whether an ordinarily prudent person should have been misled." *Id.* "Fraud is never presumed, and each of its elements must be proved by clear and convincing evidence." *Bowman*, 211 P.3d at 1218.

Defendants first argue that they are entitled to summary judgment because the "undisputed" evidence establishes that Adam advised Schlanger against purchase of the Manulife Policy. However, Schlanger testified clearly and directly to the contrary, and this is a disputed factual question.

Defendants also contend that undisputed evidence shows that, assuming Adam did advise Schlanger to purchase the Manulife Policy, he did not make any knowing or reckless false, material representations to induce Schlanger to do so. Defendants contend that Adam's advice regarding the policy, and all accompanying illustrations admittedly received by Schlanger, were accurate in every way. However, prior to purchase of the Manulife Policy, on May 13, 2002, Adam sent the following email:

> Annual premiums on a $1,000,000 face amount policy with Manulife would be $55,750 after transferring the $542,595 cash value via a section 1035 tax free exchange. As I mentioned to you, these premium numbers provide a guarantee that the policy face amount will be paid in a worst case scenario. In order to experience a scenario where the guaranteed values are realized would mean a dire situation evolved at a very high quality insurance company in a very short amount of time. Manulife would have to lower the interest rate on the policy to the guaranteed minimum of 4% and increase policy costs to the contractually guaranteed maximum. Certainly, this could happen but the chances are extremely remote. Anything better than a worse case scenario means fewer premiums in the future. To illustrate this point, let's assume Manulife continues to operate a good, solid business and interest rates stay about where they are (which is darn low): You could transfer the $542,595 from Conseco and purchase a face amount of $1,000,000. If you paid no further premiums, and operating conditions remained normal, the policy would stay in force and the death benefit due and payable for seven (7) years. Please understand that I am not suggesting that you budget paying no further premiums on a $1,000,000 policy. The message is the policy is flexible and likely to deliver good value if properly managed and carefully watched. I am going to send you some illustrations with these numbers in them and, when it is convenient, we can go over them. Seeing the numbers will, I believe, help you get a firm grasp on this concept.

(cite ). Schlanger has presented evidence that, despite following Adam's advice at every turn, the policy ceased to provide the desired death benefit at an economically feasible cost and that this was

13

contrary to representations made in this email.  Plaintiff has also presented evidence that the Trust had the ability to pay more annual premiums than Adams advised it to pay and that the Trust had the ability to pay the Policy Protection Rider premium, which Adams advised against.  This is sufficient to reach a jury as to whether the May 13, 2002 email or other advice by Adam included fraudulent or reckless representations regarding the terms, benefits, and risks of the policy that induced Plaintiff to purchase the policy.

Finally, in their reply brief, Defendants contend that (1) any and all alleged misrepresentations by Adam relate to future, unforeseeable events rather than existing facts, *see Slover v. Equitable Variable Life Ins. Co.*, 443 F. Supp. 2d 1272, 1282 (N.D. Okla. 2006) (holding that promises regarding future performance of an insurance policy were not actionable misrepresentations); and (2) Schlanger could have "ascertained the truth" with reasonable diligence, *see Silver v. Slusher*, 770 P.2d 878, 882 (Okla. 1988) (holding that an action for fraud may not be predicated on false statements when the allegedly defrauded party could have ascertained the truth with reasonable diligence).  Again, however, questions of fact exist as to whether any alleged misrepresentations related to "existing facts" regarding the Manulife Policy or unpredictable future events.  Further, based on Plaintiff's evidence, reasonable jurors could reach different conclusions as to whether Schlanger failed to exercise "reasonable diligence" under the circumstances.  Due to the complexity of the Manulife policy and the significant advisory role Adam played, the Court is unwilling to conclude as a matter of law that Schlanger failed to exercise reasonable diligence.  *Cf. Slover*, 443 F. Supp. at 1281 (finding that "[t]he clear and unambiguous language of the policy squarely contradicts the allegedly fraudulent and/or negligent oral statements" made by the

14

defendants). Defendants are not entitled to summary judgment on Plaintiff's fraudulent inducement claim.

### B. Constructive Fraud (Count 3)

To establish constructive fraud under Oklahoma law, a plaintiff must demonstrate:

(1) That the defendant owed plaintiff a duty of full disclosure. This duty could be part of a general fiduciary duty owed by the defendant to the plaintiff. This duty could also arise, even though it might not exist in the first instance, once a defendant voluntarily chooses to speak to plaintiff about a particular subject matter;
(2) That the defendant misstated a fact or failed to disclose a fact to plaintiff;
(3) That the defendant's misstatement or omission was material;
(4) That plaintiff relied on defendant's material misstatement or omission; and
(5) That plaintiff suffered damages as a result of defendant's material misstatement or omission.

*Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1180-81 (10th Cir. 2008) (internal quotation omitted) (applying Oklahoma law); *see* Ok1a. Stat. tit. 15, § 59 (constructive fraud occurs "[i]n any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him"). "Hence, even without an intent to deceive, a party can be guilty of either actual fraud or constructive fraud under the foregoing statutory law if he induces another to enter into a contract by a misleading positive material assertion not warranted by his information, or where he is shown to have no reasonable grounds for believing it to be true, even though believed by the party making it, and even if the utterer may not know the representation is false." *Doerr v. Henry*, 806 P.2d 669, 673 (Okla. Civ. App. 1990) (internal citations omitted).

Defendants made essentially the same arguments in support of summary judgment on this claim – namely, that (1) "[MSSB] provided Ms. Schlanger with clear and accurate information on all of the material terms of the Policy;" and (2) that Ms. Schlanger "made the decision to purchase

15

the Policy against the advice of Mr. Adam." (Defs.' Mot. for Summ. J. 25-26.) For the same reasons explained above, these are disputed facts and cannot form the basis of summary judgment on Plaintiff's claim for constructive fraud.

### C. Negligent Misrepresentation (Count 4)

Plaintiff relies upon Restatement (Second) of Torts § 52 as the basis for this cause of action. This section provides:

> One who, in the course of his . . . profession . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information . . . .

Restatement (Second) of Torts § 52 (cited with approval in *Stroud v. Arthur Andersen & Co.*, 37 P.3d 783, 794 (Okla. 2001)); *see also Ragland v. Shattuck Nat'l Bank*, 36 F.3d 983, 992 (10th Cir. 1994) (applying negligent misrepresentation elements to bank's alleged negligence in responding to credit inquiry) ("Under Oklahoma law, the elements of this claim were: a) a misrepresentation or omission of material fact; b) that the misrepresentation or omission was material; c) that in responding to a credit inquiry, the Bank failed to exercise the reasonable care required of competent bank officers; d) that the plaintiff reasonably relied on the Bank's misrepresentation or omission; and e) that the plaintiff sustained damage as a result of this reliance.").

Defendants again argue that "Plaintiff has offered no evidence of a misrepresentation or omission of a material fact" and that Ms. Schlanger has not shown that she "relied upon any such misrepresentation to [the Trust's] detriment." (Defs.' Mot. for Summ. J. 26.) For the same reasons explained above, the Court finds that questions of fact exist as to whether Defendants made any negligent material misrepresentations or omissions either before purchase of the Manulife Policy

16

or during its life and whether Schlanger relied upon them to her detriment. Defendants are not entitled to summary judgment on this claim.

## VI. Damages

Finally, Defendants argue that, assuming Plaintiff succeeds at trial on its breach of contract and/or tort claims, Plaintiff cannot demonstrate that it suffered any damages. Defendants argue that (1) damages have not accrued until Rose Schlanger is deceased; and (2) under the correct measure of damages for "breach of a life insurance policy," Plaintiff has not suffered damages because "the total premiums which would have been required to maintain the policy in effect exceed the death benefit which was payable under the Policy." (Defs.' Mot. for Summ. J. 31.) The first argument is moot in light of the death of Rose Schlanger. The second argument is based on the flawed premise that Plaintiff is seeking recovery for "breach of a life insurance policy." Plaintiff is seeking recovery under *Swickey* and its progeny and tort theories, and Defendants have not demonstrated Plaintiff's inability to recover damages under these legal theories as a matter of law.

## VII. Conclusion

For the reasons outlined herein, the Motion for Summary Judgment of Defendants Morgan Stanley Smith Barney LLC and J. Charles Adam (Doc. 101) is GRANTED IN PART and DENIED IN PART. Both Defendants are granted summary judgment as to Count 1. Defendant Adam is granted summary judgment as to Count 5. The motion is denied in all other respects.

**SO ORDERED this 20th day of September, 2012.**

_____
**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**